Filed 9/30/21  In re A.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | |
| | D078911 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| | (Super. Ct. No. J520178) |
| Plaintiff and Respondent, | |
| v. | |
| Y.B., | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Browder A. Willis III, Judge.  Affirmed.

Suzanne M. Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Lonnie J. Eldridge, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Eliza Molk, Deputy County Counsel, for Plaintiff and Respondent.

Y.B. (Mother) appeals an April 22, 2021 order following a contested 12-month review hearing.[1]  The only issue on appeal is whether the juvenile court erred in denying her request for in-home visits and unsupervised visits out of the home with minor A.M.  We conclude the juvenile court did not abuse its discretion in denying Mother's request and, therefore, affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

A.  *Initiation of Dependency Proceedings*[2]

In the Fall of 2019, "the San Diego County Health and Human Services Agency (Agency) received several referrals initiated by Mother regarding the possible sexual abuse involving her two children," preteen N.D. and a younger child, A.M.  "Mother observed A.M. masturbating and assumed N.D. was molesting" the child because N.D.'s biological father had molested N.D. when the now preteen was very young.[3]  (*N.D.*, *supra*, D077281.)

---

[1]  We review this order as an appealable order after judgment.  (Welf. & Inst. Code, § 395, subd. (a)(1); *In re S.B.* (2009) 46 Cal.4th 529, 531–532.)

[2]  This is Mother's second appeal in this dependency proceeding.  On our own motion, we take judicial notice of our prior unpublished opinion in *In re N.D.*, D077281, filed July 23, 2020 (*N.D.*), in which we affirmed jurisdiction and dispositional orders on amended petitions as to minors N.D. and A.M. (Evid. Code, § 452, subd. (d); see *Dwan v. Dixon* (1963) 216 Cal.App.2d 260, 265 ["a court may take judicial notice of the contents of its own records"]). We draw our factual summary of the relevant background events from this opinion to provide context for the issues in this appeal.  (*In re W.R.* (2018) 22 Cal.App.5th 284, 286, fn. 2 ["Citation of our prior unpublished opinion is permitted by California Rules of Court, rule 8.1115(b)(1) 'to explain the factual background of the case and not as legal authority.'  [Citations.]"].)

[3]  N.D.'s biological father lived in Mexico and Mother reported having no contact information for him.  He has not appeared in the proceedings as the Agency's efforts to locate him have been unsuccessful.

N.D. told Mother that A.M.'s father (Father) forced the children to masturbate together and touch each other while he filmed them.[4] "Mother later explained that she also saw A.M. drawing penises, adding to her concerns. Mother opined that Father had been recording the children for over a year and was selling the videos to fund his 'gambling problem.' In a subsequent referral, Mother recounted another recent incident when she saw A.M. limping after taking a shower. When questioned, A.M. told Mother that N.D. had put a finger up [the child's] anus." (*N.D., supra*, D077281.) N.D. denied doing so. "The police encouraged Mother to take A.M. for a medical exam but she declined to do so." (*Ibid.*)

N.D. told police officers that Mother often left the children home alone for long periods at night. N.D. also claimed that Father, who worked for the Department of Homeland Security, said he would put Mother in jail if N.D. did not allow him to film the preteen masturbating. N.D. claimed this happened multiple times and Father also made N.D. touch A.M. inappropriately, including putting a finger in the child's anus. N.D. also reported Mother was aware N.D. viewed pornography but took no action. A.M. either refused or was unable to answer any of the social worker's questions. (*N.D., supra*, D077281.)

Mother struggled with anxiety and alcohol abuse. She smoked marijuana to help her cope with her alcohol problem and to reduce her anxiety. Mother frequently left the children home alone all night and slept all day the next day. (*N.D., supra*, D077281.)

---

[4] A.M.'s father (Father) was not N.D.'s biological father. Father did not appeal the April 2021 review order. We limit any discussion regarding Father to background information relevant to the issues on appeal.

"On October 17, 2019, Mother contacted the social worker again after N.D. attempted to commit suicide with a knife while Mother was home. Other than calling the social worker, Mother took no action in response.

"The next day, the Agency filed petitions in the juvenile court as to both children under . . . section 300, subdivision (d), alleging both children had been sexually abused or there was a substantial risk of sexual abuse and Mother had failed to adequately protect the children from abuse. The children were taken into protective custody.

"At a detention hearing, the court found the children's out-of-home detention was necessary due to a substantial danger to their physical health and emotional well-being and because there were no reasonable means to protect them without removal. The juvenile court found that the Agency had made an adequate showing the children were both persons described by section 300, subdivision (d), and ordered them detained in out-of-home care." (*N.D.*, *supra*, D077281.)

Days after the detention hearing, Mother said N.D. was recanting the statements regarding Father. Mother now claimed that she knew nothing about N.D.'s sexual abuse of A.M. until recently. N.D. changed statements after a conversation at a church with Mother and Mother's friend where they told N.D. to "tell the truth." A.M. continued to refuse to talk to the social worker. Although the local police department closed the criminal investigation after N.D. recanted the allegations against Father, "the Agency remained concerned about the children's well-being and the parent's ability to safely supervise and protect the children. Accordingly, the Agency recommended the court declare both children to be dependents, that they remain in out-of-home care, and that reunification services be provided to both parents." (*N.D.*, *supra*, D077281.)

A January 2020 addendum report detailed Mother's visits with the children "and her early participation in services, but noted concerns regarding Mother's mental health.  In its assessment, the Agency continued to express concerns for the children's safety, explaining that a forensic interviewer found N.D.'s initial statements to be very credible and expressing concern that Mother was placing her own needs before the needs of the children.  The Agency believed that Mother persuaded N.D. to recant after realizing that Father's criminal prosecution would leave her without financial support." (*N.D.*, *supra*, D077281.)

At the January 2020 contested jurisdiction and disposition hearing, "the Agency moved to dismiss the original petitions filed under [Welf. & Inst. Code] section 300, subdivision (d), and to proceed on amended petitions under [Welf. & Inst. Code] section 300, subdivision (b).  The amended petitions alleged that Mother left the children 'unattended and inadequately supervised' despite her knowledge that N.D. had previously abused A.M. and suspected recent sexual abuse of the children evidenced by A.M.'s masturbation and N.D.'s viewing of pornography.  As alleged, the parents' failure to properly supervise the children despite knowledge of these concerns created a 'substantial risk [the children] will suffer serious physical harm or illness.'

"The trial court dismissed the original petitions and accepted the amended petitions.  Upon arraignment, the court accepted Father's denial of the allegations.  Likewise, the court entered Mother's denial of the allegations and she informed the court that she was 'ready to proceed on the contested jurisdiction and disposition trial.'" (*N.D.*, *supra*, D077281.)

"After considering the evidence and arguments of counsel, the court made true findings on the allegations of the amended petitions.  The court

found that the evidence demonstrated that the children were 'hyper-sexualized to the point where abuse is either suspected or obvious, [creating] a very clear protective issue.'  The court further noted that the untreated domestic violence between the parents and Mother's substance abuse created 'additional protective or safety concerns or issues.'  Additionally, the court expressed its 'alarm' at Mother's placing of blame on N.D. rather than herself.

"The court removed the children from their parents' custody, placed them in foster care, allowed supervised sibling visitation, and permitted supervised visitation between Father and A.M.  Mother was permitted to continue her supervised visits with both children, with the social worker given discretion to allow overnight visits and a 60-day trial visit.

"The court granted reunification services to parents.  Mother's case plan included sexual abuse non-protecting parenting [(NPP)] group sessions, a domestic violence course, a psychological and medical evaluation, and substance abuse counseling."  (*N.D.*, *supra*, D077281.)

B.  *First Review Period*[5]

A.M.'s placement transitioned in February 2020 from the Polinsky Children's Center to the care of nonrelated extended family members.  The child was familiar with one of the caregivers because she was a staff member at A.M.'s school.  The child initially flourished at school with the change of placement.  However, A.M. began "shutting down and crying" at school after phone calls with Mother.  A.M. cried and did not want to talk to Mother on the phone.  When asked why, the child did not respond.

---

[5]    Review hearings were delayed due to the COVID-19 pandemic, which resulted in proclamations of a state of emergency by federal, state, and local officials and operational impairments of the juvenile court.

A.M. also appeared anxious about communication with N.D. and was very upset by a video call with N.D. in March during a supervised visit. The child expressed fear of N.D. and would awake crying from nightmares about inappropriate touching by the sibling. When Mother stopped trying to contact N.D. during visits with A.M., A.M. stopped having nightmares before visits and appeared to enjoy the visits with Mother.

Mother lived with her boyfriend. She was unemployed, but participated in reunification services including a domestic violence group, NPP therapy, individual therapy, and group substance abuse sessions. Mother admitting smoking marijuana several mornings a week to help her anxiety.

Mother acknowledged in June 2020 that she should not have had N.D. bathe A.M. and should have prevented sexual abuse incidents between the children by cooking when they were at school. Mother appeared "eager to fix the situation" by sharing and discussing material she received from a therapist with A.M. during a visit. The therapist was concerned Mother's actions could disturb A.M. by discussing the issue outside of a therapeutic setting. Mother commented that A.M. would "forget" about the sexual abuse and "move on" from the incidents.

Mother was not consistent in her visits with either child at the beginning of the reporting period, frequently cancelling visits due to weather or illness. She transitioned to virtual visits in March 2020 due to the pandemic. A.M. struggled with video calls with Mother, which triggered anxiety and caused the child to "shut down." Separate in-person visits with each child resumed in June 2020. Mother appeared consistent with in-person visits, but had difficulty maintaining consistent phone calls to A.M. Mother

came prepared for visits with games, puzzles, and arts and crafts activities. Mother and A.M. laughed and played during supervised in-person visits.

The caregiver reported that Mother seemed bothered that A.M. did not want to go to her home. The caregiver reported that A.M was scared to live with Mother. At a team meeting, Mother indicated she wanted the child to visit in her home. The child's therapist expressed concern that the child reported feeling uncomfortable and unsafe to do so. The therapist planned to work to help the child feel comfortable in visiting the home.

By July 2020, Mother felt she was ready to care for both children and felt she had learned sufficient skills to properly supervise the children. She had an apartment with her boyfriend and had a room ready for the children.

N.D. reported feeling safe and comfortable in Mother's care. The Agency began assessments for unsupervised visits between Mother and N.D.

A.M., on the other hand, reported feeling "uncomfortable and fearful" about returning to Mother's house. The child had nightmares about returning to the home saying, "[M]other and [F]ather fight and [M]other hit me." Mother reportedly hit the child with a clothes hanger to the point where the child's feet bled.

The child was comfortable in the foster home. A.M. had a close relationship with the foster mother and was comfortable sharing concerns with her. The caregivers are willing to adopt or assume legal guardianship of A.M.

The Agency recommended continued services for the parents. It also recommended no contact between the siblings.

At the six-month review hearing in August 2020, the court commented that "a lot of work needs to be done across the board" and the parents needed "more insight and clarity" about what the children were expressing and how

they were reacting to the trauma they lived through. The court also noted A.M. had a long way to go toward dealing with Mother and the sibling. The court continued reunification services for the parents. The court found sibling interaction would be contrary to the safety or well-being of either child, but allowed the Agency discretion to begin sibling visitation with concurrence of minor's counsel.

C. *Second Review Period*

A.M.'s progress with therapy during this period was slow. The child tended to "shut down" when discussing issues related to the parents and sibling, preferring to talk about the foster family than issues with the biological family. A.M. had trouble expressing emotion and wanted to please adults. The child expressed to Mother an interest in unsupervised visits with her, but later expressed discomfort and fear to the caregiver about unsupervised visits with Mother. A.M. still had reservations about having contact with N.D.

N.D. and Mother progressed from structured unsupervised visits to overnight visits twice per week in November 2020.

Mother continued to be inconsistent with visits and phone calls for A.M. On one occasion, she took the child out of a camp setting early, before the visitation supervisor arrived. Other times, Mother cancelled visits shortly before the scheduled visit due to her own appointments. When visits occurred, however, the child appeared comfortable. A.M. enjoyed Sunday visits when they could play without doing school work.

Mother reported in January 2021 that she stopped attending her domestic violence services because she had completed as many hours as she was told to complete. However, her therapist reported in February 2021 that Mother still had 12 sessions remaining and several absences. Mother

participated in some sexual abuse services for a NPP, but had not contacted the provider since a session in December 2020. The provider indicated Mother still needed NPP sessions because N.D. was transitioning back into Mother's home and the provider wanted to make sure Mother was being protective. Mother still needed to attain objectives of "understanding and monitoring for symptoms."

In February 2021, mother was scheduled to visit A.M. three days a week. However, mother declined a virtual visit with A.M. and cancelled several other visits shortly before the scheduled time saying she did not feel well or had therapy with N.D. The social worker was concerned that Mother had not learned or demonstrated she can put A.M.'s needs ahead of her own. The social worker was also concerned that Mother had not made progress, was not taking advantage of having additional visits before her services ended, and had exhausted the time available to work with family visitation coaching services, having had those services available for nearly a year.

The social worker told Mother that a 60-day trial visit with N.D. could potentially impact reunification with A.M. because the siblings had not had contact since the opening of the case. The social worker was worried A.M. might not be ready to be placed with Mother if N.D. were in the home. Mother accused the social worker of arranging to have A.M. adopted and made allegations that the caregivers were neglecting A.M.'s needs by feeding the child fast food.

A.M.'s caregiver reported concerns about Mother's cancelled visits and failing to call for virtual visits when scheduled. The caregiver believed the inconsistent visitations were causing A.M. to have behavioral issues at school. The caregiver noticed A.M. had difficulty following school rules and talking back to teachers after the child had phone calls with Mother. The

caregiver reported that when they tried to call Mother, she could not answer if the older child was present and it appeared hard for Mother to "juggle both kids."

When the social worker talked to Mother in March 2021, Mother said she wanted visits with A.M. in her home because the child was "used to going to the house." Mother insisted she could have visits in her home and that N.D. would either remain in another room or go to a babysitter.

When the social worker explained she could and should visit A.M. at a location in the community, Mother said she wanted to speak to a protective services supervisor. She denied knowing anywhere else they could meet. When asked if she was having phone calls with the child, Mother said since she was seeing the child, she let the child take a break from calls.

The Agency learned that Mother went to A.M.'s school to drop off gifts on March 5, 2021, and brought N.D. with her. Mother said she brought N.D. because they were going shopping afterward. Mother was adamant that N.D. stayed "down the street" and did not get close to the school. The social worker expressed concern that A.M. could have seen N.D. near the school and asked why Mother did not leave N.D. at their home, which was within walking distance of the school. Mother said the Agency was trying to "twist" the story. She said she did nothing wrong in taking N.D. with her.

When the location for a visit changed from a park to the visitation center due to weather, Mother cancelled the visit. The social worker encouraged Mother to visit the child, even if the visit was indoors. Mother resisted having visits anywhere other than her home or outside at a park. Mother did not communicate with the Agency about where N.D. was during Mother's visits with A.M., despite the Agency's clear expectation she would do so.

At a child and family team meeting on March 30, 2021, Mother said she felt she was able to safely care for A.M. and wanted unsupervised visits with the child in her home. She felt she could protect A.M. from further abuse. The Agency expressed concern that Mother was not open to scheduling additional visits with A.M. Mother complained that the child was "always dirty and had poor hygiene." Mother thought the caregiver was giving the child unhealthy food resulting in weight gain.[6] The Agency was unable to develop a visitation plan with Mother because Mother became disconnected from the meeting when the social worker asked her for ideas regarding additional visits. Mother did not reconnect despite calls and texts.

The caregiver continued to report that Mother did not consistently call for scheduled virtual visits with A.M. A.M. expressed concern about being hit if the child was alone with Mother for visits. When asked how the child would feel about visiting with N.D. if someone else was there to watch them, A.M. immediately responded, "No!"

N.D. was placed with Mother on April 16, 2021 with family maintenance services for Mother. The no-contact order remained in place between N.D. and A.M. because the court determined contact between the siblings would be contrary to A.M.'s safety and well-being.

In an addendum report filed before the April 2021 review hearing, the Agency reported A.M. appeared comfortable in the caregivers' home and was making slow progress in therapy. A.M. struggled with expressing some emotions and "tends to want to please the adults" in the child's life. A.M. expressed to Mother an interest in unsupervised visits, but then expressed to

---

[6]  A.M. was seen by a physician in July 2020 who was not concerned about the child's weight gain. The physician was concerned, however, about continued bedwetting.

the caregiver, the Agency, and the therapist feeling uncomfortable or unsafe in Mother's care without supervision.

The Agency continued to be concerned about returning A.M. to the parents' care. Mother admitted her lack of supervision placed the children at increased risk of sexual abuse, but she did not have realistic ideas on how to supervise the children to prevent further incidents of abuse. Mother said she planned to supervise the children at all times, but also planned for them to share a bedroom in her two-bedroom home. Mother tried to address the trauma directly with the children, without therapeutic input, which caused the children to have emotional reactions and confusion. Although Mother said she understands the trauma A.M. experienced, she continued to push sibling visitation.

Mother did not seem to understand the trauma A.M. experienced or the need to process it at the child's own pace. The agency also had concerns about Mother bringing the children together, intentionally or unintentionally. Mother did not want to schedule visits until her concerns about the child's hygiene and weight were heard, but she did not understand how withholding time impacts the child. Mother was having only one weekly visit with A.M. and was not open to scheduling additional visits. The Agency recommended continued supervision of visits until Mother can demonstrate a willingness to put A.M.'s emotional needs ahead of her own.

D. *Contested Review Hearing*[7]

At the contested review hearing, Mother's counsel asked the court to allow Mother to have unsupervised visits with A.M. and to have visits in the family home. Counsel pointed to Mother's engagement and progress with her services to the point that N.D. had been returned to the home and appeared to be thriving. Counsel argued that Mother had a plan to protect A.M.

The social worker did not agree with Mother's desire for visits in the family home because N.D. resides in the home. Although the Agency asked Mother to inform it about N.D.'s whereabouts during visits with A.M., this had not occurred. If N.D. were in the home during visits with A.M., it could be a violation of the no-contact order.

The social worker also testified to concerns about Mother having unsupervised visits with A.M. outside the family home because Mother has difficulty understanding the child's trauma. Mother indicated that A.M. would forget about the trauma if the child did not talk about it. The social worker also pointed to the incident where N.D. accompanied Mother on a trip to A.M.'s school. Mother had trouble understanding contact between the children could impact both children.

Mother testified she understood N.D. and A.M. are not supposed to see each other, but stated she did not know why the court made that order. She stated she would be able to make sure A.M. had no contact with N.D. She said a woman who lives nearby could look after N.D. during A.M.'s visits to the home, but she could not readily provide the woman's name. Mother said she would allow the social worker access to the home during visits with A.M.

---

[7]    The 12-month review hearing was continued several times before the contested hearing was held on April 22, 2021, which was originally scheduled as the 18-month review date.

14

to monitor visits. Mother said she has seen a psychologist and feels prepared to protect A.M.

In making its ruling, the juvenile court stated it had no doubt that Mother loved both children. However, it was clear to the court that Mother still lacked understanding. Mother testified that she did not understand even why the court made the original no-contact order between the siblings and other actions and statements showed a lack of understanding of the trauma A.M. suffered.

The court stated it did not "have a sense that [Mother] would fully abide by the no-contact order" because Mother did not understand how easily A.M. would be traumatized by contact with N.D. The court believed there was "a long way to go still" in not only A.M.'s recovery, but Mother's understanding of the depth of the trauma and the effect of the trauma. The court did not believe it was appropriate for A.M. to have visits in the home because it did not believe Mother could "completely seal off the environment and protect by distance" A.M. from N.D. The court also felt supervised visits were still warranted.

The court continued services for both parents and ordered liberal supervised visits for Mother, but not in the home. The agency had discretion to lift the order for supervised visits. However, the previous no-contact order with the sibling remained in place.

After an additional plea by Mother, the court stated it did not feel, based on the evidence, that it was appropriate to have A.M. in the home yet or to have unsupervised visits. The court stated it would reconsider the order once there was a showing of a greater understanding of the trauma.

DISCUSSION

Mother's sole contention is that the court abused its discretion in denying her request for in-home visits with A.M. and unsupervised visits with A.M. Visitation is an essential component of any reunification plan, and should occur as frequently as possible, consistent with the well-being of the child. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972; Welf. & Inst. Code, § 362.1, subd. (a)(1)(A).) However, "[n]o visitation order shall jeopardize the safety of the children." (Welf. & Inst. Code, § 362.1, subd. (a)(1)(B).) The court may limit a parent's contact with a child on finding such limitation is in the child's best interest. (See *In re Cheryl H.* (1984) 153 Cal.App.3d 1098, 1133 disapproved on another ground in *People v. Brown* (1994) 8 Cal.4th 746, 763.)

"[T]he court must define the rights of the parties to visitation. The definition of such a right necessarily involves a balancing of the interests of the parent in visitation with the best interests of the child. In balancing these interests, the court in the exercise of its judicial discretion should determine whether there should be any right to visitation and, if so, the frequency and length of visitation. The court may, of course, impose any other conditions or requirements to further define the right to visitation in light of the particular circumstances of the case before it." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.)

Because the juvenile court is given wide discretion to make visitation orders in the child's best interests, we apply the abuse of discretion standard in reviewing such orders. (*In re Sofia M.* (2018) 24 Cal.App.5th 1038, 1044; *In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356 (*Brittany C.*).) In reviewing a court's exercise of discretion, we do not reverse the order unless

16

the court made an arbitrary, capricious, or patently absurd determination. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.)[8]

Here, although Mother made some progress in gaining insight into the trauma and protective issues involving her children, even at the time of the review hearing she did not understand why a no-contact order was in place for the siblings. Mother was dismissive of concerns by A.M.'s therapist that the younger child needed more time to process the trauma before having contact with N.D. Instead, Mother pressed for contact between the siblings believing the child could "forget" the trauma. Mother also did not appear to understand the Agency's concern with her taking N.D. near A.M.'s school where A.M. could have seen N.D.

Even though Mother testified she would keep the siblings apart, she could not provide the name of the person she intended to care for N.D. during A.M.'s visits. She also did not have a track record of informing the Agency of N.D.'s location during visits with A.M.

Mother continued to have difficulty putting A.M.'s needs ahead of her own. She refused to make arrangements for additional visits with A.M. if they could not be on her terms. She did not consistently call A.M. at scheduled times. When the Agency met with Mother to create a plan for additional visits, Mother exited the meeting rather than respond to an

---

[8]     Courts have suggested there is a disagreement about the standard of review for visitation. (*Brittany C.*, *supra*, 191 Cal.App.4th at p. 1356.) We note some courts apply a substantial evidence test to orders denying visitation. (See *In re Mark L.* (2001) 94 Cal.App.4th 573, 581, fn. 5 disapproved on another point in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re T.M.* (2016) 4 Cal.App.5th 1214, 1219 [noting disagreement, but finding order proper under either standard].) Here, the court did not deny Mother visitation, but set limits on where and how the visitation would occur. Under either standard, however, we conclude the order was proper.

17

invitation for other ideas about locations for visits. At the time of the review hearing, Mother was only visiting A.M. once per week at the visitation center.

After considering the evidence, the court determined that "there is a long way to go still" not only for A.M.'s recovery, but for Mother's "true understanding of the depth" and effect of the trauma. The court was not convinced that Mother could "completely seal off the environment" to protect A.M. and felt supervised visits were still warranted.

In addition to its own observations of Mother at the hearing and over the course of the dependency case, the juvenile court was entitled to credit the opinions of the Agency's social workers, who had direct contact with the relevant parties in this case as well as experience in determining the risks associated with placement or visitation plans for dependent children. (See *In re Luke M.* (2003) 107 Cal.App.4th 1412, 1427 ["Social workers are frequently recognized as experts in assessing risk and placement of children and selecting permanent plans for children."].)

Mother contends for the first time on appeal that she could address the concerns of the Agency and the juvenile court by complying with a requirement that she confirm with the Agency that N.D. was being supervised by another caregiver before in-home visits with A.M. or if the in-home visits were monitored. We generally do not consider contentions raised for the first time on appeal. (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 685; *In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1528 [argument not raised below is forfeited on appeal]; *Amato v. Mercury Casualty Co.* (1993) 18 Cal.App.4th 1784, 1794 ["[i]t must appear from the record that the issue argued on appeal was raised in the trial court" and "[i]f not, the issue is waived [or forfeited]"].) In any event, Mother did not demonstrate her ability to comply with such

18

directives.  The evidence before the juvenile court showed that Mother had not complied with prior Agency direction to confirm N.D.'s whereabouts during visits with A.M.  Based on the record before us, we conclude the court did not abuse its discretion in limiting visitation to supervised visits outside of the family home.

DISPOSITON

The order is affirmed.

IRION, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.